Filed 1/17/24  P. v. Partain CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>JOHN OLIVER PARTAIN,<br><br>      Defendant and Appellant. | D081542<br><br><br>(Super. Ct. No. SCS317350) |


APPEAL from a judgment of the Superior Court of San Diego County, Enrique Camarena, Judge.  Affirmed.

Cindy Brines, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Paige B. Hazard, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found John Oliver Partain guilty of second-degree murder. (Pen. Code,[1] § 187, subd. (a).)  The jury further found that Partain personally used a deadly and dangerous weapon, a hammer, in committing the offense. (§ 12022, subd. (b)(1).)  Partain contends on appeal that: (1) there was insufficient evidence to prove that he was guilty of second-degree murder and not voluntary manslaughter; (2) the trial court erred in its response to a jury question about the voluntary manslaughter instruction; and (3) the cumulative effect of the court's errors violated his due process rights.

We conclude that substantial evidence supports the jury's implicit finding that Partain did not act in the heat of passion upon adequate provocation when he killed his wife.  We further conclude the trial court did not err in responding to the jury's question about voluntary manslaughter. Because we find no error, we reject Partain's argument that the cumulative effect of any errors violated his due process rights.  Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Killing*

Partain and the victim, Billie Jean Partain, were married for 36 years and lived in Chula Vista, California.  They struggled financially for many years during their marriage.  In November 2019, Billie suffered serious injuries in a car accident.  She needed assistance walking for months afterwards, and her sister, R.S., noticed that Billie's personality changed. For example, she was not "as happy as she used to be" and was more verbally aggressive after the accident.  She argued with others more often, displayed anger and emotional instability, and "was always afraid" that someone would "put her away."  Partain also noticed Billie was more "mean" and irritable

---

[1]     Further undesignated statutory references are to the Penal Code.

2

than she used to be. R.S. suspected that Billie suffered brain damage from the accident.

On the morning of February 25, 2021, Billie and Partain fought after Billie put a piece of bread with peanut butter in the toaster, which she had done before. They fought periodically throughout the day. At some point, Partain went outside to the side of the house to get a hammer. He walked back through the sunroom, kitchen, living room, and hallway, then stood in the doorway of the bedroom where Billie was in bed watching television. Partain then approached Billie and hit her with the hammer 75 times, including 34 strikes to her head, killing her.

Afterwards Partain called two cousins "to let them know what [he] had done," and one of his cousins called the police. Officers responded to Partain's home, but he refused to come out, and he spoke with a crisis negotiator for several hours. Officers eventually forced entry into the home and found Partain on the living room couch, appearing intoxicated and bleeding from his wrists from self-inflicted wounds. The officers found Billie's body in the bedroom.

*B. Partain's Testimony*

Partain testified in his own defense at his August 2022 trial. He described his difficult childhood, including the death of his mother at a young age and being the victim of physical and sexual abuse by his family members. He drank alcohol to cope with the abuse and dropped out of school in the ninth grade after being bullied. He eventually joined the Navy in 1979 and met Billie a few years later. Partain described Billie as being "a wonderful person," with whom he enjoyed a positive relationship until the car accident.

After the accident, Partain visited Billie in the hospital daily, and then cared for her at home after she spent some time living with R.S. Partain

3

helped Billie with showering, using the bathroom, and other needs, but Billie often yelled at him, called him names, and rejected his help. At times, Billie also threw things at Partain in anger, including a peanut butter jar and a cell phone. They also argued about their finances. Partain was not working after Billie's accident, and he was concerned about losing the house. Partain said he felt "horrible" about himself during this time, and he had been drinking more heavily since Billie's accident.

In early February 2021, Partain told R.S. that he wanted to sell the house, move in with R.S., and put Billie in an assisted living facility. R.S. rejected the idea, and shortly thereafter Partain called a veterans' crisis hotline seeking mental health help because he was irritated with Billie. He was told, however, that the next available appointment was in March 2021.

Partain said he had a "fairly good memory" of the day of the killing. He and Billie had been fighting "off and on" throughout the day, starting with the argument over the toaster. After a fight later in the day during which Billie yelled at Partain, he "snapped" and "lost all conception of reality." He admitted he intended to kill Billie, and then himself. After attacking Billie with a hammer, Partain doused various rooms with gasoline, unplugged the gas line from the wall furnace, and started drinking whisky and watching television. He thought that when the police came, they would use a flash-bang and burn the house down. Partain cut his wrists so he would "bleed out and die." He also told officers who arrived on the scene that he had firearms, hoping they would "come in and shoot [him] by force."

*C. Neuropsychologist's Testimony*

Dr. Catherine Ward, a clinical and forensic neuropsychologist, testified as a defense expert. After assessing Partain, she concluded he was not malingering and had a "borderline to low average" IQ. Dr. Ward further

concluded that he suffered from "other specified dissociative disorder," "major depressive disorder recurrent, severe with mood congruent psychotic features," severe alcohol abuse, and "other personal history of psychological trauma."  She testified that Partain was likely decompensating around the time of the killing due to the stress from being Billie's caretaker, financial hardship, and the disarray in their home.

*D. Jury Instructions and Closing Arguments*

The People charged Partain with murder and personal use of a deadly weapon.  (§§ 187, subd. (a) & 12022, subd. (b)(1).)

The trial court gave instructions to the jury on first- or second-degree murder with malice aforethought (CALCRIM No. 520), first-degree murder (CALCRIM No. 521), and voluntary manslaughter in the heat of passion as a lesser included offense (CALCRIM No. 570).  The court gave the following instruction for voluntary manslaughter:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.
>
> "The defendant killed someone because of a sudden quarrel or in the heat of passion if:
>
> "1. The defendant was provoked;
>
> "2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;
>
> "AND
>
> "3. The provocation would have caused a person of average

5

disposition to act [rashly]² and without due deliberation, that is, from passion rather than from judgment.

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"In order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation may occur over a short or long period of time.

"It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient.

---

²     The reporter's transcript uses the word "rationally" here instead of "rashly," which deviates from the written instruction as provided in the clerk's transcript. Given that neither party objected at the time, the words sound similar, and the context supports that the parties understood the instruction should read as "rashly," "[w]e assume this rendering resulted from a transcription error. [Citations.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 945, fn. 7 (*Beltran*) [assuming transcription error where reporter's transcript "ungrammatically render[ed]" the phrase " 'do an act rashly' " as " 'do *and* act rashly' "]; see *People v. Smith* (1983) 33 Cal.3d 596, 599 [" 'It may be said . . . as a general rule that when, as in this case, the record is in conflict it will be harmonized if possible; but where this is not possible that part of the record will prevail, which, because of its origin and nature or otherwise, is entitled to greater credence [citation]. Therefore whether the recitals in the clerk's minutes should prevail as against contrary statements in the reporter's transcript, must depend upon the circumstances of each particular case.' "]; *People v. Freitas* (2009) 179 Cal.App.4th 747, 750, fn. 2 ["When a clerk's transcript conflicts with a reporter's transcript, the question of which of the two controls is determined by consideration of the circumstances of each case."].)

6

> "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts would have reacted from passion rather than from judgment.

> "If enough time passed between the provocation and the killing for a person of average disposition to cool off and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis.

> "The People have the burden of proving beyond a reasonable doubt that the defendant did not kill as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of murder."

(See CALCRIM No. 570.)

The prosecutor argued during closing that the jury should find Partain guilty of first-degree murder because the killing was willful, deliberate and premeditated. She pointed to Partain's own testimony that he intended to kill Billie, and highlighted evidence that he went outside to retrieve a hammer, walked through multiple rooms, and beat Billie to death while she sat watching television.

Defense counsel argued in closing that Partain should be found not guilty because his dissociative disorder made him unable to form the necessary intent for murder during the incident. His counsel further argued that even if the jury believed Partain had the necessary intent for murder, it should find him guilty of the lesser included offense of voluntary manslaughter in the heat of passion. Counsel pointed to evidence that Partain endured a long period of provocation after Billie's accident, including Billie's mistreatment of Partain and their financial struggles. Regarding the "reasonable person standard," he said that when it comes to sufficient

7

provocation, the question for the jury was not "would a reasonable person kill another person" in those circumstances, but rather "[w]ould they act out of passion, that's it."

In rebuttal, the prosecutor said that the provocation element for voluntary manslaughter requires determining whether "the provocation would have caused a person of average disposition to act [rashly]³ and without due deliberation.  It's important to note that this isn't talking about the average person killing.  It's would the average person have acted [rashly] and without due deliberation on the same set of facts."

*E. Jury Questions and Verdict*

While the jury was deliberating, it sent a note to the trial court, which stated in relevant part:

> "The Jury would like clarification on [CALCRIM No.] 570 voluntary manslaughter specifically[:] 'In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment[.']
>
> "1) Does this mean the end result of action, or everything that leads up to the event
>
> "2) Does the reaction mean emotional vs. logical. . . ."

The court and counsel agreed to provide a response based on the trial court's instruction in *Beltran*:

> "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or heat of passion.

---

³ For the reasons discussed in footnote 2 and below, we assume that the use of "rationally" instead of "rashly" here in the reporter's transcript resulted from a transcription error.  (See *Beltran, supra,* 56 Cal.4th at p. 945, fn. 7.)

8

"Heat of passion does not require anger, rage, or any specific emotion. It can be any violent or intense emotion that causes a person to act without due deliberation and reflection.

"Now, in order for heat of passion to reduce a murder to voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as defined in Instruction 570.

"While no specific type of provocation is required, slight or remote provocation is not sufficient. Sufficient provocation can occur over a short or a long period of time.

"Now, it is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. You must decide whether the defendant was provoked and whether the provocation was sufficient.

"In deciding whether the provocation was sufficient, consider whether a person of average disposition **would have been provoked and how such a person would react** in the same situation knowing the same facts."

(See *Beltran, supra*, 56 Cal.4th at p. 944 (emphasis added).) Although the response did not repeat the three elements of voluntary manslaughter included in the original instruction, it closely tracked the rest of the language in CALCRIM No. 570, except for the bolded portion, which was taken from an earlier version of CALCRIM No. 570 given in *Beltran*.

The court sent the response to the jury and then recessed for lunch. After the break, defense counsel expressed concern that the court's response would misleadingly suggest that the proper inquiry is "how would a person act in this situation," not "whether a person would act under passion rather than judgment in this situation[,]" which is the appropriate question.

9

Counsel argued that the jury should be further instructed to clarify the court's response, and the court denied his request.

The jury reached a verdict soon afterwards and found Partain guilty of second-degree murder, with a true finding that he personally used a deadly and dangerous weapon. Partain timely appealed.

DISCUSSION

I

Partain first contends there was insufficient evidence for the jury to find that he committed second-degree murder, rather than the lesser included offense of voluntary manslaughter. Specifically, he argues that the People failed to disprove that he acted in the heat of passion in response to sufficient provocation. We conclude substantial evidence supports the jury's implicit finding that Partain did not kill Billie under provocation that would have caused a person of average disposition to act rashly and without due deliberation.

*A. Governing Law*

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) "[S]econd degree murder . . . is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507; see §§ 187, subd. (a) & 189.) " 'A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter.'" (*People v. Breverman* (1998) 19 Cal.4th 142, 153 (*Breverman*), quoting § 192.) Voluntary manslaughter is a lesser included offense of murder. (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197 ["Lesser included offenses of first degree premeditated murder include second degree

10

murder, voluntary manslaughter, and involuntary manslaughter"]; *Breverman*, at p. 154.)

An intent to unlawfully kill generally constitutes malice. (§ 188.) But a defendant who unlawfully kills in the "heat of passion" lacks malice and is guilty of voluntary manslaughter. (§ 192, subd. (a); see *People v. Lasko* (2000) 23 Cal.4th 101, 109–110.) Provocation distinguishes this form of manslaughter from murder. (*People v. Rangel* (2016) 62 Cal.4th 1192, 1225.) " 'To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' " (*Ibid.*) "[I]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." (*Ibid.*, internal quotation marks omitted.) Whether someone killed with malice aforethought (constituting murder) or killed in the heat of passion (constituting voluntary manslaughter) is a factual matter for the jury to decide. (See, e.g., *People v. Wright* (2015) 242 Cal.App.4th 1461, 1482 ["whether adequate provocation and heat of passion have been shown are fundamentally jury questions"].)

The heat of passion requirement for manslaughter has both objective and subjective components. (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) "The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively." (*Ibid.*) The objective component requires that the passion be such " 'as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances,' " because " 'no defendant may set up his own standard of conduct and justify or excuse

11

himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man.' [Citation.]" (*Id.* at pp. 1252–1253.)

On review for sufficiency of the evidence supporting a conviction, we must " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt.' [Citations.]" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 657–658.) We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the conviction. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "Given this deferential standard of review, a 'defendant bears an enormous burden in claiming there is insufficient evidence' to support a conviction." (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1020.)

*B. Analysis*

There was substantial evidence at trial from which the jury could reasonably determine Partain did not kill Billie in the heat of passion because of legally sufficient provocation. First, as the relevant jury instruction notes, "[i]f enough time passed between the provocation and the

12

killing for a person of average disposition to 'cool off' and regain his or her clear reasoning and judgment, then the killing is not reduced to voluntary manslaughter on this basis." (CALCRIM No. 570.) Partain and Billie argued the morning of the killing, and they continued to argue "off and on" throughout the day, but the evidence does not show they were in the midst of a heated argument at the time of the killing. Although Partain claims he just "snapped" after Billie yelled at him, evidence shows he had time to choose the specific instrument he used to kill Billie, walk out of the house to retrieve it, walk back through several rooms inside the house to find Billie, and even pause in the doorway while she watched television. And once Partain began attacking Billie with a hammer, he did not stop until he struck her 75 times, with nearly half of those strikes landing on her head. From these circumstances, the jury reasonably could infer that "any passions that may have been aroused upon first [being yelled at] had cooled so that the killing became an act of revenge or punishment." (*People v. Fenenbock* (1996) 46 Cal.App.4th 1688, 1704; see *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [passion for revenge will not reduce murder to manslaughter].)

Second, although there was evidence of the subjective component of provocation, evidence of the required *objective* component was less substantial and did not compel a finding in Partain's favor. (See *People v. Padilla* (2002) 103 Cal.App.4th 675, 679 ["Failing the objective test, Padilla's hallucination cannot as a matter of law negate malice so as to mitigate murder to voluntary manslaughter—whether on a 'sudden quarrel or heat of passion' theory of statutory voluntary manslaughter"].) Billie's provocative conduct consisted of moodiness, harsh words, yelling, and on some occasions, thrown household items. While a jury could infer such behavior was difficult to tolerate, a jury could also reasonably conclude that such provocation would

13

not naturally arouse judgment-clouding passion in the mind of an ordinarily reasonable person. (See *Beltran, supra*, 56 Cal.4th at p. 950.) This conclusion is supported by evidence that Partain and Billie argued frequently, and even argued specifically about the toaster on at least one prior occasion. A jury could reasonably conclude from that evidence that the day of the killing was like many others in their troubled marriage. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1216 [insufficient evidence to support giving voluntary manslaughter instruction, and in particular the objective component of provocation, where "bickering, yelling, and cursing were the norm" between defendant and victim].) And even though they were arguing throughout the day, Billie was "in bed when [Partain] began his physical assault" on her. (*Ibid.* [insufficient evidence to support voluntary manslaughter instruction where victim was in bed when defendant assaulted her].)

Whether adequate provocation and heat of passion have been shown are fundamentally jury questions because jurors are " 'much better qualified to judge of the sufficiency and tendency of a given provocation, and much more likely to fix, with some degree of accuracy, the standard of what constitutes the average of ordinary human nature, than the judge whose habits and course of life give him much less experience of the workings of passion in the actual conflicts of life.' [Citation.]" (*Beltran, supra*, 56 Cal.4th at p. 948.) Here, the People presented sufficient evidence from which the jury could conclude that the passions of an ordinarily reasonable person in Partain's circumstances would have cooled before the killing, and that such a person also would not have reacted rashly without due deliberation. Accordingly, we will not disturb the jury's verdict finding Partain guilty of murder on sufficiency of the evidence grounds.

14

II

Partain next argues that the trial court's response to the jury's question about the voluntary manslaughter instruction was erroneous. The People argue that Partain forfeited the issue by failing to object until after the court sent the response to the jury. We conclude that regardless of whether the issue is forfeited, the court committed no reversible error in its response.

The trial court has a duty to instruct the jury on the law applicable to the case, and if the jury has a question about the law during deliberations, the court must provide information needed to clear up any confusion the jury may have. (§ 1138; *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212.) We review the court's response to the jury's question for abuse of discretion. (See *People v. Waidla* (2000) 22 Cal.4th 690, 714, 745–746.)

As noted, during deliberations the jury asked for clarification on how to decide whether the evidence of provocation was sufficient to find Partain guilty of voluntary manslaughter. Specifically, the jury asked a question about the objective component of provocation and whether it should be decided based on "the end result of action, or everything that leads up to the event[.]" The jury also asked whether "the reaction" to the provocation meant "emotional" or "logical." The court responded—with the parties' agreement— by repeating portions of the original voluntary manslaughter instruction (CALCRIM No. 570), along with the following language from *Beltran*:

> "In deciding whether the provocation was sufficient, consider whether a person of average disposition **would have been provoked and how such a person would react** in the same situation knowing the same facts."

(See *Beltran, supra*, 56 Cal.4th at p. 944 (emphasis added).)

15

Partain contends that the court's response inaccurately suggested that the jury should consider whether a reasonable person would *kill* in this situation, rather than whether a reasonable person would *act rashly*. But the Supreme Court in *Beltran* found this same language (which came from a prior version of CALCRIM No. 570) was not ambiguous as written, and under ordinary circumstances, was "unproblematic" because "[t]elling the jury to consider how a person of average disposition 'would react' properly draws the jury's attention to the objective nature of the standard and the effect the provocation would have on such a person's state of mind." (*Beltran, supra*, 56 Cal.4th at p. 954.)

Importantly, unlike in *Beltran*, the People's closing argument in this case did not muddy the waters. (*Beltran, supra*, 56 Cal.4th at pp. 954–955 [finding that prosecutor's argument may have confused the jury's understanding of the instructions, but was not prejudicial].) Citing the reporter's transcript, Partain claims the prosecutor argued that the jury should consider whether an ordinary person in the same circumstances would have acted "*rationally* and without judgment" and "*rationally* and without due deliberation," instead of "*rashly*." As noted, we conclude that this must have been a transcription error, because the written jury instructions use the correct word "rashly," the words "rashly" and "rationally" sound similar, the court reporter also transcribed the word "rashly" as "rationally" when the court read the instructions to the jury, neither party objected, the use of the word "rationally" would not make logical sense in this context, and the context supports that the parties knew the correct word was "rashly." (See *Beltran*, at p. 945, fn. 7.)

Partain further contends that the jury may have been confused by the prosecutor's hypothetical example of parents discovering someone abusing

16

their child, and then shooting the abuser with the intent to kill them. The prosecutor, however, did not place undue emphasis on the hypothetical parents' intent to kill as a *response*, but explained that "under those facts [the parents] were acting *directly under that provocation* seeing that when they came home, that that decision was made *under the heat of passion* and that an ordinary person under that same set of facts *also would have acted* [*rashly*] *and without judgment*. That is voluntary manslaughter." (Italics added.) The prosecutor went on to say that the objective provocation component examines whether "a person of average disposition to act [rashly] and without due deliberation. *It's important to note that this isn't talking about the average person killing.* It's would the average person have acted [rashly] and without due deliberation on the same set of facts." (Italics added.) The prosecutor later made clear that in deciding whether the provocation was legally sufficient, the jury should consider "whether a person of average disposition in that same situation and knowing the same set of facts *would have reacted from passion rather than judgment.*" (Italics added.)

Furthermore, Partain does not dispute that CALCRIM No. 570 correctly states the law (see *Beltran, supra*, 56 Cal.4th at p. 956 ["the relevant mental state [is] properly set out in CALCRIM No. 570"]), and the court's response expressly directed the jury's attention to "provocation as defined in Instruction 570." That instruction defines the objective component of provocation as that which "would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." The instruction thus answered the jury's question by referring it back to CALCRIM No. 570. "The trial court was well within its discretion to refer the jury back to the very instruction that provided a specific answer to the jury's question. No more information was

17

needed or required." (*People v. Kopp* (2019) 38 Cal.App.5th 47, 66–67.) Although a trial court has a duty to help the jury understand applicable legal principles, "the court need not elaborate on the standard instructions in every instance. When the original instructions are full and complete, the trial court has discretion to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.]" (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1331.) We therefore conclude that the court did not abuse its discretion in responding to the jury's question.

DISPOSITION

The judgment is affirmed.

BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.